IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

```
FILED
JAN 27 2021
CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

**UNITED STATES OF AMERICA,**

v.                          **CRIMINAL ACTION NO. 4:20-cr-52**

**JOSHUA ELEY,**

**Defendant.**

*MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant Joshua Eley's ("Defendant" or "Mr. Eley") Motion to Suppress. ECF No. 24. Defendant, through counsel, filed a memorandum in support of his Motion; the Government filed a response; and, Defendant filed a reply. ECF Nos. 24, 27, and 29. A hearing on Petitioner's Motion was held on January 14, 2020. ECF No. 43. For the reasons stated at the hearing and discussed below, Defendant's Motion to Suppress is **GRANTED**.

## I. BACKGROUND & PROCEDURAL HISTORY

Just after 5:30 pm on April 24, 2020, Newport News police officers observed Defendant— a young, Black man—walking near the 700 block of 16th street in Newport News, Virginia. Suppress Hr'g Tr. at 20-23, 58:1-5; ECF No. 24 at 1. At first, Defendant was walking on the sidewalk of the street. *Id.* at 57-58. Detective Daniel Akaratovic ("Officer Akaratovic"), with two additional police officers, drove past Defendant in an unmarked police car and recognized Defendant as "Joshua Eley." *Id.* at 78-80. The officers noticed that Defendant was "looking back" at them as they drove by and one of the officers asked the others, "[d]o you guys want to go and talk to him?" *Id.* The officers agreed to go talk to Mr. Eley and at that point, Officer Akaratovic made a U-turn in his patrol vehicle. *Id.* When asked why the officers turned around to speak with Defendant, Officer Akaratovic stated that "it was just odd that [Defendant] was near 16th Street"

1

because ordinarily "Mr. Joshua Eley was usually always around the areas close to the station." *Id.* at 84-85. Officer Akaratovic testified that he did not suspect Defendant of any criminal activity at the time that he made the U-turn. *Id.* at 79. Various officers then exited Officer Akaratovic's vehicle and walked towards Defendant on the street. ECF Nos. 27-1, 27-2, and 27-3.

While continuing to walk down 16th street, Defendant crossed the street without making use of a crosswalk. Suppress Hr'g Tr. at 57-58. The record is unclear as to the precise location of any nearby crosswalks; however, a witness to Defendant's crossing– Officer Mark Hillman "Officer Hillman"– testified that crosswalks were located "[f]urther down the road and a little behind me." *Id.* at 58:1-5. While Defendant crossed the street, Officer Hillman approached Defendant at 25 miles per hour in an unmarked patrol vehicle, requiring Officer Hillman to brake at approximately 50 yards in front of Defendant as he crossed the street. *Id.* at 39-40. Alternatively, Officer Hillman also testified that he began to brake approximately 30 feet from Defendant. *Id.* at 56:19-22.

Officer Hillman then parked the car and exited the vehicle along with his partner, Officer Paulino. *Id.* at 21-24. Officer Hillman testified that when he parked the vehicle, his "intent at that time was just to talk to Mr. Eley" because "[b]ased on [his] training and experience… people who are carelessly walking in the middle of the road could have several things going on." *Id.* at 24. Officer Hillman further testified that he intended to talk to Mr. Eley because "he was breaking the law, [] just walking in front of traffic, in front of my vehicle." *Id.*

At another occasion during Officer Hillman's testimony, Officer Hillman responded "yes, sir" when asked "[n]ow, when you first got out of the car, you said you didn't suspect [Defendant] of a crime… is that correct?" *Id.* at 62:7-12. Officer Hillman later responded "[c]orrect, yes, sir"

2

when asked "so the only thing that you were concerned about is that you believe that [Defendant] was jaywalking?" *Id.* at 62:13-15.

When asked whether the police report from the incident stated that he stopped Defendant due to a jay-walking violation, Officer Hillman responded, "I don't recall that that exactly says those words. I believe it says that Mr. Eley was walking across the street and almost was in front of me, sir." *Id.* at 63:7-11. No police report of the incident was presented at the hearing, or entered into evidence, by either party. *See generally id.*

Upon exiting his vehicle, Officer Hillman turned on his body camera to allow the camera to "buffer up." *Id.* at p. 26. Without turning on the record button, Officer Hillman testified that he yelled out to Defendant, "'[h]old on a second. Let me talk to you for a moment,' [or] something along that line." *Id.* In response, Officer Hillman stated that "Mr. Eley disregarded me. He didn't pay any attention to me." *Id.* at 27. Officer Hillman furthers that "I continually asked him to stop and talk to me for a moment, and he continually walked down the sidewalk." *Id.* Defendant ultimately turned around in response to Officer Hillman's commands. *Id.* at 30. At that point, Officer Hillman alleges that he observed an extended magazine in Defendant's right jacket pocket and Defendant's hands were also in his pockets. *Id.* at 27. Officer Hillman further alleges that at the time he made this magazine observation, Defendant was facing him straightforward and he was "able to observe his face, the front of his body, and his hands." *Id.* at 30.

Officer Hillman notes that based upon his training and experience, he "assumed that there might have been a firearm due to the magazine [] portraying [sic] out of the jacket." *Id.* at 28. At that time, Officer Hillman drew his weapon and "continued giving Mr. Eley commands to show [] his hands and to stop." *Id.* at 30. Officer Hillman testified that he was "worried that [he] would have to deploy lethal force," and later during the arrest, Officer Hillman joked that "his range time

3

almost got extended" since he and other officers had just departed the gun range that morning. *Id.* at 31, 34.

Video evidence further demonstrates that at some point, one of the arresting officers removed a gun (with a magazine inserted in the clip) from Defendant's person and placed the gun on the ground. ECF No. 27-2, 27-4, and 27-5. This is contrary to Officer Hillman's first recollection of the event for which he stated, "the firearm fell out of Mr. Eley's right pocket." Suppress Hr'g Tr. at 35. Prior to the hearing, upon review of the video evidence, Officer Hillman retracted this statement, at which time he recalled that *he* "actually removed the firearm out of Mr. Eley's pocket." *Id.*

Just after the gun was removed from Defendant's person, Defendant was placed in hand restraints as several additional officers (at least three more according to the video footage) approached the scene. *Id.* These officers had body camera footage of the incident from the time they arrived on scene. ECF Nos. 27-1, 27-2, and 27-3. Some of those officers were previously in the patrol vehicle with Officer Akaratovic. Suppress Hr'g Tr. at 73-74. Officer Hillman did not record the event until after Defendant was already detained. *Id.* at 47-49; ECF No. 27-4. Of the five, possibly six, officers at the scene of the arrest, none of the officers were of Black or African descent. *Id.* at 61-62, 83-84. Defendant did not resist arrest once he was in handcuffs. *Id.* Defendant was ultimately apprehended, read his Miranda rights, and admitted that he was a prior felon in possession of a firearm. ECF Nos. 27-2, 27-4, and 27-5.

Officer Hillman testified that he had no reason to believe Defendant was armed prior to exiting his vehicle. Suppress Hr'g Tr. at 28. Officer Hillman furthered that "it was Mr. Eley's disregard to my commands, observing the extended magazine, and him keeping his hands in his pockets continuously [that] gave me the impression that there was a firearm involved." *Id.* at 30.

4

On August 21, 2020, a federal grand jury returned a one count indictment charging Defendant with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 3. On October 28, 2020, Defendant filed a Motion to Suppress all the evidence obtained in violation of the Fourth Amendment pursuant to Rule 12 of the Federal Rules of Criminal Procedure. ECF No. 24. The Government filed its response on November 12, 2020. ECF No. 27. Defendant replied on November 18, 2020. ECF No. 29. The Court held a hearing on Defendant's Motion to Suppress on January 14, 2020. Trial is currently scheduled for February 23, 2021. Having heard the parties and reviewed their briefing, this matter is now ripe for judicial determination.

## II. LEGAL STANDARD

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. An investigatory stop constitutes a seizure under the Fourth Amendment. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A law enforcement officer can execute an investigatory stop if that officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *United States v. Slocumb*, 804 F.3d 677, 681 (4th Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)) (internal quotations omitted).

In order to perform a *Terry* stop, the police office must have a reasonable articulable suspicion that a crime is about to be or has been committed. *See United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013) (citing *Terry*, 392 U.S. at 21). This reasonable articulable suspicion "must [have a] particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 539 (quoting *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009)). The police officer "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.* (quoting *Terry*, 392

5

U.S. at 21). Additionally, the Court must "give due weight to common sense judgments reached by officers in light of their experience and training." *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010). The Court makes this determination based on the facts and the totality of the circumstances. *Black*, 707 F.3d at 537. What might be considered innocent conduct viewed in isolation may give rise to reasonable belief when viewed in totality. *Id.* at 539.

"[I]f an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity." *United States v. El*, 5 F3d. 726, 730 (4th Cir. 1993). In other words, even if an officer had some other, pretextual reason for stopping a citizen, the stop is valid as long as that officer possesses probable cause or reasonable suspicion to conduct the stop.

The mere fact that an officer approaches an individual, however, does not immediately implicate *Terry*. *United States v. Brown*, 401 F.3d 588, 593 (4th Cir. 2005) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). A police officer engages in a consensual encounter if they simply ask a few questions and "'a reasonable person would feel free to disregard the police and go about his business.'" *Id.* (quoting *Bostick*, 501 U.S. at 434).

### III. DISCUSSION

To begin, the Court assesses when a police encounter ripens into an investigatory stop by "taking into account all of the circumstances surrounding the encounter," and asking whether the "police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). The facts demonstrate that a *Terry* stop occurred when the Newport

6

News police exited their vehicle and demanded that Defendant stop, causing Defendant to subsequently turn around to heed their commands. By demanding that Defendant stop, Officer Hillman's conduct communicated that Defendant was not at liberty to leave.

Upon detention, after allegedly catching a glimpse of the magazine, the officers searched Defendant's body and recovered the magazine clip and a gun, among other items. To lawfully conduct a *Terry* stop, the officers were required to have a reasonable, articulable suspicion that a crime was about to be or had been committed. *See Black*, 707 F.3d at 537. In justifying the *Terry* stop, the Government describes two events that gave rise to reasonable suspicion. First, the government alleges that Officer Hillman personally observed Defendant violate Va. Code Ann. § 46.2-928 (the "jay-walking" statute) when Defendant crossed 16th street. ECF No. 27 at 8. Second, the government argues that Officer Hillman personally observed a magazine clip in plain view, protruding from Defendant's clothing. *Id*. The Government asserts that either of these occurrences provides sufficient evidence of reasonable suspicion.

In contrast, Defendant alleges that he did not violate the Virginia statute for jay-walking at the time of his arrest. ECF No. 29 at 1-3. Defendant further alleges that the Government lacks sufficient evidence to corroborate whether the police officers saw a magazine clip prior to detaining Defendant. *Id*. at 6-12. Additionally, Defendant argues that possession of a magazine clip alone does not give rise to reasonable suspicion. *Id*. Accordingly, Defendant believes that the arrest, the search of his person, the seizure of his belongings, and any incriminating statements made subsequent to his arrest were all unlawfully obtained as a result of a Fourth Amendment violation. The Court will address the parties' arguments to assess whether the facts support a Fourth Amendment violation.

### A. Jay-walking Violation

Defendant's alleged violation of the jay-walking statute is akin to a traffic stop. Fourth Amendment case law routinely permits investigatory stops when drivers violate minor traffic laws such as rolling through stop signs, running red lights, or having a broken taillight. *Michigan v. Long*, 463 U.S. 1032 (1983); *United States v. Holmes*, 376 F.3d 270, 280–81 (4th Cir. 2004), cert. denied, 543 U.S. 1011 (2005). Similarly, violating the jay-walking statute is sufficient cause to stop a pedestrian. See *United States v. Richardson*, 2018 WL 6198301 at *4 (D. Col. Nov. 28, 2018) ("An officer needs only 'a reasonable articulable suspicion that a particular motorist'—or pedestrian, in this case—'has violated any of the traffic or equipment regulations of the jurisdiction.'" (internal citations omitted)).

Upon review, the Court finds the Government's evidence in support of an alleged jay-walking violation sufficiently lacking. In order to perform a *Terry* stop, the police officer must have a reasonable articulable suspicion that a crime is about to be or has been committed. *See Black*, 707 F.3d at 537 (4th Cir. 2013) (citing *Terry*, 392 U.S. at 21). In this instance, the crime at issue is a violation of Va. Code Ann. § 46.2-923, which reads:

> "A. When crossing highways, pedestrians shall not carelessly or maliciously interfere with the orderly passage of vehicles. They shall cross, wherever possible, only at intersections or marked crosswalks. Where intersections contain no marked crosswalks, pedestrians shall not be guilty of negligence as a matter of law for crossing at any such intersection or between intersections when crossing by the most direct route."[1]

The government's evidence of a violation of this statute is insufficient for several reasons. First, of the ten exhibits the Government submitted, no police report of the incident was filed

---

[1] As of November 9, 2020, and effective March 1, 2021, the following language will be added to Va. Code Ann. § 46.2-923: "C. No law-enforcement officer shall stop a pedestrian for a violation of this section. No evidence discovered or obtained as the result of a stop in violation of this subsection, including evidence discovered or obtained with the person's consent, shall be admissible in any trial, hearing, or other proceeding." 2020 Va. Acts __, Ch. 51; Va. Senate Bill 5029; Va. House Bill 5058.

among them. Because of this, the Court can point to no business record of the incident which, presumably, should have indicated whether the officers did in fact pursue Defendant based upon the alleged jay-walking violation or for some other reason. In lieu of a police report, the Government furnished eye-witness testimony from Officer Hillman, the arresting officer.

Second, the Court is also deprived of video evidence of the alleged jay-walking incident from either Officer Hillman or Officer Paulino, as both individuals had their Newport News Police Department-issued body cameras in the off position at the time Defendant crossed the street. Gov'ts Exs. 4 and 5. Officer Hillman, in particular, did not turn on his body camera until he exited the vehicle and did not press record until after Defendant was already placed in hand constraints. *Id.* at 32:8-12.

Third, Officer Hillman testified that when he first saw Defendant that day, Defendant "was crossing in the middle of the road" and "[t]here was no crosswalk where he was crossing the street." Suppress Hr'g Tr. at 23:3-4. Officer Hillman was driving an unmarked patrol vehicle and began to brake approximately 50 yards in front of Defendant. *Id.* at 39:12-14. According to the statute, using the most direct route to cross a street—away from an intersection or crosswalk—is not a crime "[w]here intersections contain no marked crosswalks." Va. Code Ann. § 46.2-923. Upon review, the Government did not supply any evidence of the nearby intersections to assess whether there were crosswalks nearby. The only evidence of any potential crosswalks is a vague statement by Officer Hillman alleging that crosswalks were located "[f]urther down the road and a little behind me." Suppress Hr'g Tr. at 58:1-5. Accordingly, the Government's evidence of any alleged jay-walking violation is substantially wanting.

But the Government need not prove that a jay-walking violation *actually* occurred. Instead the evidence presented to the Court must prove that the officer "observe[d] unusual conduct which

lead[] him reasonably to conclude in light of his experience that criminal activity may be afoot." *Slocumb*, 804 F.3d at 681 (quoting *Terry*, 392 U.S. at 30) (internal quotations omitted). Taking all the facts before the Court into consideration, and upon assessing the credibility of Officer Hillman's testimony, the Court finds that Officer Hillman lacked reasonable suspicion to stop Defendant.

The Court makes a credibility finding as to Officer Hillman's testimony. At the suppression hearing, there were several statements and occurrences that cause the Court to question the veracity of Officer Hillman's observations.

First, Officer Hillman provided conflicting testimony as to his purpose for speaking with Defendant that afternoon. On one hand, his intent was "just to talk to Mr. Eley" because Officer Hillman "just wanted to make sure that he was okay." *Id.* at 24:13-23. On the other hand, Officer Hillman alleges that he stopped Defendant because he was "breaking the law." *Id.* Upon inquiry of the Court, Officer Hillman testified that he did not believe Defendant was breaking the law; however, Officer Hillman later stated that he stopped Mr. Eley because he suspected him of jaywalking. *Id.* at 7-15. Based upon this testimony, the Court is unsure whether Officer Hillman truly intended to speak with Defendant as a result of an alleged jay-walking violation or just to speak with him. This intention is made even more unclear considering that Officer Akaratovic, and the accompanying officers in his patrol vehicle, turned their car around to "talk" to Defendant for reasons that the Court finds absolutely incredible. The officers turned around, exited their vehicle, began walking toward Defendant, and intended to speak with him all because they had never seen him walking on 16th street (as if Defendant was somehow limited to a certain section of town) and because Defendant was "looking" at them (as if ordinary citizens do not look back at police officers who are simultaneously looking at them).

Additionally, Officer Hillman reportedly told fellow officers that the gun on Defendant's person "fell" out of his pocket during the arrest; however, video evidence contravened such statements. In fact, Officer Hillman himself removed the gun from Defendant's person and placed it on the ground. During the hearing, Officer Hillman admitted that he did not recall the manner in which the gun was placed on the ground until he reviewed the video evidence.

Third, Officer Hillman did not record the incident with his body camera equipment until after Defendant was already placed in hand constraints, despite Newport News Police Department policy providing that "body-worn camera[s] shall be utilized during all investigative or enforcement contacts." ECF No. 29-1 at 3.

Fourth, Officer Hillman made a questionable statement related to his frame of mind at the time during Defendant's arrest, a statement this Court does not take lightly. After arresting Defendant, Officer Hillman "joke[d]" that "his range time almost got extended," thus impliedly joking that he almost shot Defendant. *Id.* at 30. It is the Court's view that such a statement disregards the serious nature of Officer Hillman's duties as an officer.

Fifth, on several occasions during his testimony, Officer Hillman could not properly describe the distance between himself and Defendant during the incident. *Id.* at 56-57. Upon questioning from Defense counsel, he stated that he began to brake his vehicle approximately 50 yards away from Defendant. *Id.* at 39-40. Upon questioning from the Court, he stated the distance was approximately 30 feet. *Id.* at 56:19-22. Officer Hillman's distance from Defendant at that time is crucial in assessing the reasonableness of stopping Defendant for allegedly "carelessly or maliciously interfer[ing] with the orderly passage of vehicles," in violation of the jay-walking statute. Va. Code Ann. § 46.2-923. Importantly, Officer Hillman's two recollections of the distance between he and Defendant substantially differ in that 50 yards is five times that of 30 feet.

As the litany of Fourth Amendment case law demonstrates, a police officer's attempt to merely talk to a pedestrian has far different legal ramifications than an attempt to stop someone presumably breaking the law. Officer Hillman testified that he repeatedly told Defendant to stop once Officer Hillman exited his vehicle. *Id.* at 26-27. Officer Hillman gave these instructions and Defendant turned around to heed them prior to Officer Hillman seeing the magazine clip on Defendant's person. *Id.* at 27:2-14. By instructing Defendant to stop, Officer Hillman triggered a seizure event under the Fourth Amendment. *See Arvizu,* 534 U.S. at 273 (holding the Fourth Amendment's prohibition on "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles that fall short of traditional arrest."); *Brendlin v. California,* 127 S. Ct. 2400, 2405 (2007) (explaining that the protections of the Fourth Amendment are invoked at the moment when a suspect is "seized" or stopped by the police, even when that seizure falls short of an arrest). This seizure was unlawfully predicated upon conduct that does not give rise to a reasonable suspicion of criminal activity. Because the stop occurred prior to Officer Hillman's alleged observation of the magazine clip, the Court declines any assessment of the Government's second argument—that the magazine clip also gave rise to reasonable suspicion.

Taking these factors into consideration, among others, the Court not only finds evidence of jay-walking lacking, but further finds that the officers' recollection of events, in addition to their conduct prior to and during both the stop and the arrest, are unreliable. Because Officer Hillman allegedly saw the magazine and arrested Defendant only after Defendant's Fourth Amendment rights were violated, the evidence obtained subsequent to Defendant's seizure is inadmissible.

## IV. CONCLUSION

For the reasons stated on the record and discussed above, Defendant's Motion to Suppress is **GRANTED**, and all evidence obtained from the unlawful stop and arrest is **SUPPRESSED**.

The Court **DIRECTS** the Clerk to provide a copy of this Order to Defendant and the United States Attorney.

**IT IS SO ORDERED**.

Newport News, Virginia
January 27, 2021

_____
UNITED STATES DISTRICT JUDGE

13